WELLS FARGO & CO. EXPRESS et al. v. WILSON. (No. 1424.)†

(Court of Civil Appeals of Texas. Texarkana. April 8, 1915. Rehearing Denied April 15, 1915.)

1. RAILROADS ⚸274 — INJURIES TO LICENSEE —EMPLOYÉ OF EXPRESS COMPANY.

A railroad company, which has permitted an express company to use its station for the conduct of its business, owes to the express company's employés the duty to keep the premises in a reasonably safe condition.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 868–872; Dec. Dig. ⚸274.]

2. MASTER AND SERVANT ⚸106—INJURIES TO SERVANT—SAFE PLACE TO WORK—OWNERSHIP BY ANOTHER.

The fact that a railroad station, regularly used by an express company in the conduct of its business, was owned by the railroad, does not relieve the express company from its duty to keep the station reasonably safe for its employés to work in.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 193–198; Dec. Dig. ⚸106.]

3. MASTER AND SERVANT ⚸276—INJURIES TO SERVANT—SUFFICIENCY OF EVIDENCE—DEFECTIVE PLACE TO WORK.

In an action for injuries to an express company's employé, resulting from his slipping on ice which had accumulated in the archway of a railway station, evidence held sufficient to warrant the jury in finding that the ice was formed from water that had leaked out of a gutter over the archway.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. ⚸276.]

4. MASTER AND SERVANT ⚸276—INJURIES TO SERVANT — DEFECTIVE PLACE TO WORK — PROXIMATE CAUSE.

Where ice was formed on the floor of an archway of a railroad station from water which leaked from a gutter and froze during a sudden cold snap, the fact that the cold weather co-operated with the negligence of the company in not repairing the gutter did not show that the negligence was not the proximate cause of the injury to a servant who slipped on the ice.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. ⚸276.]

5. MASTER AND SERVANT ⚸278—INJURIES TO SERVANT—SUFFICIENCY OF EVIDENCE—SAFE PLACE TO WORK.

In an action for injuries to an express company's employé who slipped and fell on ice accumulated on the floor of the station archway, evidence held sufficient to warrant the jury in finding negligence in not discovering the leaky gutter from which the water came, in not removing the ice, and in providing insufficient light.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ⚸278.]

6. MASTER AND SERVANT ⚸286—INJURY TO SERVANT — QUESTIONS FOR JURY — NEGLIGENCE.

Where the facts are such that reasonable minds may differ whether a master exercised ordinary care to provide a safe place for work, it could not be said, as a matter of law, that there was no negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ⚸286.]

Appeal from District Court, Lamar County; A. P. Dohoney, Judge.

Action by J. W. Wilson against Wells Fargo & Co. Express and another. Judgment for the plaintiff, and defendants appeal. Affirmed.

The appellee sued the express company and the Texas & Pacific Railway Company for damages for personal injuries. The appellee is an employé of the express company, as driver of its express wagon. His duties are to take express packages received for shipment from the express company's local office on Main street to the railroad depot and then load them on the train, and to unload from the train and take to the local office all express packages destined to Paris. A four-wheeled truck pulled by hand is furnished by the express company for the purpose of accomplishing the loading and unloading of the wagon at the railway depot, and appellee used it. At 7:30 o'clock p. m. of January 3, 1912, the appellee, while performing his duties in trucking express packages from the train of appellant railway company to the wagon of appellant express company, through the archway of the railway depot, slipped and fell to the brick floor of the archway and was thereby grievously injured. According to appellee's testimony, he was caused to slip and fall by stepping upon a sheet of ice covering the space of about the width of a candy bucket, which had been permitted to form over the brick floor under the archway, and which ice, owing to the insufficient lighting of the archway, he had not observed. The acts of negligence alleged are: (1) Allowing holes in the gutter extending across the north side of the archway, which permitted water to drip from the gutter and fall on the brick platform and freeze in the archway; (2) permitting the formation of ice beneath and under the archway; (3) having poor and inadequate lighting of the depot platform and archway; (4) permitting the

─────

⚸For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.

above conditions to exist after both actual and constructive knowledge of them; (5) failure in the above respects to exercise ordinary care to furnish and maintain a safe place for appellee to work in, upon the part of the express company, because of the relation of master and servant between it and appellee, and, upon the part of the railway company, because of its general invitation to all persons having business with it to use its premises, and by reason of the use by the express company and its employés of the premises and cars of the railway company under contract or agreement with the railway company. The defendants denied the allegations and pleaded assumed risk and contributory negligence, the want of knowledge on their part of the existence of any ice under the archway, or reason to anticipate any sudden formation of ice, and a proper and skillful construction and maintenance of the depot building and platform. There was a jury verdict in favor of appellee.

At the time of the injury the depot of the railway company at Paris was situated between the railway tracks on the south and a public street on the north. The building was so planned and constructed as to have between the east wall of the ticket office and the west wall of the baggage room a passage or archway, which was of the length of 24 feet from wall to wall east and west, and of the width of 30 feet north and south. The archway was covered by the roof of the building, but it was open and without walls on the north and south. The eaves of the roof, situated on the north and south, extended three feet over the width of the walls of the entire building, and, as to the archway, were provided with gutters with a down pipe from the guttering located on each side of the archway, which fastened into tiling under the ground. The brick floor under the archway is so laid as to slope a little both to the north and to the south from the center line. The archway is regularly used by the employés of the railway company and the public generally for transaction of railway business, and also is and has been regularly used by the express company and its employés in the necessary handling of its express business from the public street to the railway tracks and train and from the railway tracks and train to the public street. It reasonably appears that the depot and archway are owned by the railway company, but the archway is used and occupied regularly and generally, and has been so used for some time previous to the injury, by both the railway company and the express company, as a means and place required for the handling of their respective business as common carriers. The regular use and occupancy of the archway by the express company is, as inferably, with the knowledge and consent of the railway company and under some unexplained business arrangement for hire. In the center of the archway, and about 18 inches from the ceiling, which is between 12 and 14 feet from the flooring, there is suspended a flat reflector, between 8 and 10 inches wide, provided with 3 sockets for electric light globes of 16 candle power. At the end of Main street, and directly in front of the passenger department of the depot, and about 50 or 60 feet from the north opening of the archway, the railway company maintained an arc light, which throws light to the north opening of the archway, but not very far into it. The evidence presents a state of conflict respecting whether the three lights in the archway were burning on the night of the injury. According to appellee, only one of the lights was burning, and the other two were not giving any light, and, as a consequence, the archway was dimly lighted, which fact was known to appellee. According to appellee, he complained, a month before the injury, to the agent of the railway company, about the insufficiency of the lights; and he worked for a month knowing the lights had not been fixed. The agent testified that he had no recollection of any complaint by appellee, and never promised to fix the lights. Three days before the injury, it had rained and sleeted, and the weather had continued cold up to noon of the day the injury occurred, at which time it cleared up, and the sun began to shine, and for a time it was warm enough to thaw ice that had formed. But at 4 o'clock of that afternoon the weather again changed to cold and freezing, and at 7 p. m. was in that condition. The wind was blowing hard from the north. It had not rained, sleeted, or snowed that day. On the day of injury appellee met the 3:30 p. m. train, and when he left the depot at about 3:50 p. m. there was no ice formed or on the floor of the archway. After dark appellee met the 6:59 and the 7:30 trains. Appellee knew the condition of the weather. While trucking express matter through the archway from this latter train to the express wagon, appellee was injured. He testified that the ice he fell upon was a spot of frozen water within the archway, about four or five feet from the west wall, and four or five feet back of the column at the northwest entrance of the archway, which would be practically south within the archway between seven and eight feet from the eaves of the building. There is a state of conflict as to the existence of any ice within the archway. According to the witness Newell:

"I saw a small piece of ice. It was on the north side, about halfway between the arch and the stobs of the brick pavement. The ice I saw was on this brick platform on the north side of the arch, about three feet from the west edge. It was a little thin crust of ice about a foot square, frozen over on the brick. That piece of ice was all I saw there. There was no ice in the archway, or any other place."

The stobs of the pavement are five feet from the eaves of the roof. This witness also says the place appellee fell was "on the northwest part of the outside of the archway." According to appellee, at 10:30 o'clock

next morning he visited the place of injury and discovered that the gutter on the north eaves of the roof of the archway leaked. "The leak in the gutter," according to appellee, "was right up just a little east of the west wall on the north side," which was between seven and eight feet from the ice, as located by him. It was shown by some evidence that in the early part of the day of injury there was melting ice and sleet on the roof. It was shown that the agent of the railway company was provided with salt to be used to put upon ice forming upon the depot platforms in freezing weather. It does not appear whether or not the gutter had been inspected at all before the injury. It is concluded that there are circumstances sufficient to authorize the jury to find, as involved in their verdict, that the gutter extending across the north side of the archway was defective, and the water leaking from it was blown by the hard wind from the north onto the brick floor seven or eight feet under the archway and formed there into ice, which ice the appellee, owing to insufficient lighting, did not observe or know was there, and stepped upon it and fell and was injured thereby. In deference to the verdict, we conclude that the appellants were guilty of negligence, as alleged, proximately causing the appellee's injury and that appellee was not guilty of contributory negligence and did not assume the risk.

Park, Moore & Hardison and Long & Wortham, all of Paris, for appellants. Wright & Patrick and B. B. Sturgeon, all of Paris, for appellee.

LEVY, J. (after stating the facts as above). [1, 2] The railway company, having furnished the archway to the express company for which appellee was using it, owed the duty to exercise ordinary care to keep the archway in a reasonably safe condition from obstacles. Railway Co. v. Beasley, 155 S. W. 183. And it is concluded that, under the circumstances of this case, the mere fact that the express company did not own the archway does not relieve it from the duty of exercising ordinary care to furnish appellee a reasonably safe place to work. The express company regularly used and occupied the archway as a place for the conduct of its business. Therefore it is thought that the first, second, and fourth assignments of error should be overruled.

[3] The third assignment predicates error in the sixth paragraph of the court's charge, in so far as it refers to the leaky gutter. The objection made is that there is no evidence that any leak from the gutter caused the ice upon which appellee slipped. It is believed that, in the respect mentioned, an issue for the jury is raised by the evidence. It must be regarded as a fact that there was a spot of frozen water at the time, for both appellee and the appellants' witness Newell testified there was. Appellee located the ice he fell upon within the archway, about four or five feet from the west wall, and four or five feet back of the column of the northwest entrance of the archway, which would be practically south within the archway, between seven and eight feet from the gutter under the eaves of the roof. The witness Newell located the ice outside the archway, about three feet from the eaves. The precise location of the ice was therefore a matter much in conflict. But taking the location of the ice as fixed by appellee, between seven and eight feet within the archway, such fact could not be regarded, it is thought, as necessarily so conclusive as to not be open to reasonable difference of opinion that it did not come, in the first instance, from a leak in the gutter. It was shown that the archway was open on the north, and the gutter under the eaves was between 12 and 14 feet in height from the floor. Appellee says, and it does not appear to the contrary, that a north wind was blowing hard, which inferably was from 4 o'clock in the afternoon, when the weather changed to cold and freezing. It was further shown that the sleet and rain that had fallen on the 3d before had begun in the early afternoon to thaw and run on the roof. In the view of all these circumstances, and there being no other evidence tending to account for the presence of frozen water on the floor, the jury, as within their province, might reasonably infer that the sleet melted and ran into the gutter, leaked from the gutter, and was blown by the wind to the distance of seven or eight feet on the floor in the archway, and there, by reason of the freezing weather, formed into ice. The slight slope in the floor might or might not be considered by the jury as a sufficient condition to exclude the idea that water would remain at the placed fixed by appellee. Appellee testified that on the next morning the gutter there was leaking. And in the absence, as here, of evidence showing an inspection of the gutter and its good condition and quality, the jury might fairly infer that the leaky condition of the gutter existed the afternoon before.

It is not thought that the court erred in refusing the special charge made the basis of the fifth assignment of error; and it is overruled.

[4, 5] The remaining assignments of error, which are here disposed of together, are to the effect that there is failure of proof that appellee's injury was caused by any negligence on the part of the appellants. The maintenance of the archway, with gutters under the eaves to carry off the water from the roof of the building, was a part of the permanent arrangement of the building. And it is thought that the circumstances shown warranted the jury in inferring as a fact that, owing to a defect in the gutter, water from the roof got on the floor of the archway and, by reason of the cold weather,

175 S.W.—32

was there formed into ice, thereby exposing appellee to danger of slipping and injuring himself. The place where the ice was located was where appellee was required to go in the regular and customary performance of his duties. The evidence would warrant the jury in finding that the appellee did not know, and by reason of the inadequate lighting of the archway did not observe, that the ice was on the floor. Therefore it may be said that the element of cold weather, combined with the fact of a leaky gutter, caused the accumulation of the ice on the floor under the archway, and that the existence of the ice there was an obstruction creating a danger to appellee in the performance of his duties, and which obstruction was not, by reason of inadequate light, observed by appellee. While the element of cold weather was beyond the control of appellants, the injury did not result solely from the operation of this nonresponsible agency. And to discharge the obligation of making the place of work reasonably safe involved, within the terms of the law, the use of reasonable care to guard against so much of the danger as ordinary prudence would anticipate and ordinary effort avoid. According to the evidence, the weather began to change into cold and freezing, and the wind to blow hard from the north, at about 4 o'clock in the afternoon. At noon, it appears the sleet of several days before began to thaw and run. It might be inferred by the jury from these circumstances that appellants had reasonable notice that the weather elements were such as to require the use of reasonable care on the part of appellants to see to it that the gutter was in proper condition and reasonably free from defects to prevent water from the gutter getting into the archway and forming ice. It being the duty of appellants to exercise ordinary care to provide and keep a reasonably safe place in which to work, it could be inferred that appellants had notice of the defect in the gutter; it being a part of the original and permanent arrangement of the place. There does not appear any evidence respecting inspection of the gutter and its good condition at any time before the injury, or that the defect was sudden or not discoverable by ordinary inspection. The inadequacy of the lighting was, as the jury could say, known to appellants. The time within which the ice formed in the archway is a matter of inference from the evidence. At 3:50 p. m. there was no ice on the floor. At 4 o'clock it began to turn cold and freezing. At 7:30 o'clock appellee slipped on the ice. The ice, therefore, formed at some time between 4 and 7:30 o'clock. It appears that the agent of the railway was provided with salt for the purpose of melting ice on the platforms as it might occur, and that from 4 o'clock to the time of injury was within the business hours of the work for employés of appellants at the place, and the place was easily and conveniently accessible to observation of the agents. It is believed that, under all the circumstances, the sole question to be determined is whether the result produced by the negligence of appellants was one which might reasonably have been anticipated, and the question is one that the jury in their province must determine.

[6] After a careful consideration of all the facts, we conclude that they are such that the minds of men may reasonably differ as to whether or not the appellants, owing the duty of providing a reasonably safe place in which to work, exercised ordinary care to discharge the duty owing appellee. Therefore it could not properly be held, we think, that no negligence, as a matter of law, was proven.

The judgment is affirmed.